*910 DISSENTING OPINION
JUDGE COHN JUBELIRER
I respectfully disagree with the majority that answering the questions of what is a “customer-generator” and what constitutes “net metering” under the Alternative Energy Portfolio Standards Act (AEPS Act),[1] as implemented under a tariff of a public utility, is not within the jurisdiction of the Public Utility Commission (PUC). Although the majority justifies its exclusion of the PUC from this determination on the basis that “[statutory construction is a responsibility of the judiciary,” (Maj. Op. at 909), all administrative agencies operate within a statutory framework. It is beyond purview that the PUC is empowered with jurisdiction over the supervision and regulation of all public utilities and their provision of services in the Commonwealth, the restructuring of the electric utility industry, matters related to public utility tariffs, and provisions of the AEPS Act, and is considered to have specialized expertise to which the courts are to defer when reviewing decisions within its expertise. See, e.g., ARIPPA v. Pa. Pub. Util. Comm’n, 966 A.2d 1204, 1211-13 (Pa. Cmwlth. 2009) (finding that the PUC has jurisdiction, and thus authority, to determine who owns alternative energy credits under the AEPS Act, “a process that implicates the particular expertise of the [PUC,] ” and that such determinations are given great deference); Pa. Power Co. v. Pa. Pub. Util. Comm’n, 932 A.2d 300, 307 (Pa. Cmwlth. 2007) (stating that the PUC’s “interpretation of the AEPS Act is entitled to great deference and will not be reversed unless clearly erroneous”); Cnty. of Erie v. Verizon North, Inc., 879 A.2d 357, 364 (Pa. Cmwlth. 2005) (stating that matters related to public utility tariffs are peculiarly within the expertise of the PUC and, as such, are outside the original jurisdiction of the courts).
The majority’s critical mistake is evaluating the AEPS Act in a vacuum instead of in pari materia with the relevant portions of the Public Utility Code[2] and the Electric Generation Customer Choice and Competition Act (Competition Act),[3] all of which govern the provision of safe, reliable, and efficient electrical service. The determination of whether a generation facility qualifies as a “customer-generator,” thus entitling it to the special compensation provisions of “net-metering,” has a significant impact on the provision of electric service, and is intertwined with the interpretation and application of West Penn Power Company’s (West Penn) tariff and its provision of services to its other customers. I believe that is why the Legislature explicitly gave the PUC “the power to carry out the responsibilities delineated within th[e AEPS A]ct,” including specific authority to develop regulations on net metering for customer-generators. Sections 5 and 7 of the AEPS Act, 73 P.S. §§ 1648.5, 1648.7. Importantly, the interpretation of these Acts must be uniform and consistent throughout the Commonwealth without regard to the location of a *911 generation facility. Because it is clear to me that the PUC has jurisdiction over this determination, I must respectfully dissent.
The Pennsylvania Supreme Court has instructed that “[t]o accommodate the role of the court with that of the agency, the doctrine of primary jurisdiction (or primary exclusive jurisdiction) has been developed.” Elkin v. Bell Telephone Co., 491 Pa. 123, 420 A.2d 371, 376 (1980). This doctrine “creates a workable relationship between the courts and administrative agencies wherein, in appropriate circumstances, the courts can have the benefit of the agency’s views on issues within the agency’s competence.” Id. (citing Feingold v. Bell of Pa., 477 Pa. 1, 383 A.2d 791, 798-99 (1977) (Pomeroy, J., dissenting)). Importantly for our purposes, this doctrine “requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency ivhich administers the scheme.” Id. (emphasis added) (quoting Weston v. Reading R.R. Co., 445 Pa. 182, 282 A.2d 714 (1977) (quoting United States v. W. Pac. R.R. Co., 352 U.S. 59, 68, 77 S.Ct 161, 1 L.Ed.2d 126 (1956))). Our Supreme Court recognized that the courts must not be “too hasty in referring a matter to an agency,” and must evaluate whether doing so would be “a true fostering of the purposes of the doctrine.... ” Id. at 377. Thus, we are to refer a matter to an agency where:
the subject matter is within an agency’s jurisdiction and where it is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar .... Also weighing in the consideration should be the need-for uniformity and consistency in agency policy and the legislative intent.
Id. at 376-77.
This case meets the Elkin requirements and requires judicial abstention in favor of the PUC with regard to these questions. The PUC is the agency that “administers the [regulatory] scheme” under the AEPS Act. The Legislature expressly conferred upon the PUC “the power to carry out the responsibilities delineated within th[e AEPS A]ct” and to “monitor the performance of all aspects of th[e] act,” in cooperation with the Department of Environmental Protection (DEP). 73 P.S. §§ 1648.5, 1648.7. In 17 instances, the AEPS Act references the PUC and confers upon it specific duties and responsibilities to implement the Act, such as the authority to develop regulations on net metering interconnection standards for customer-generator facilities. See, e.g„ Sections 2, 3, 5, and 7 of the AEPS Act, 73 P.S. §§ 1648.2, 1648.3, 1648.5, 1648.7.[4] In compliance with its mandate, the PUC promulgated those regulations. See AEPS Act Regulations codified at Title 52 (Public Utilities), Part I (Public Utility Commission), Subpart C (Fixed' Service Utilities), 52 Pa. Code *912 §§ 75,1-75.70. The AEPS Act regulations govern disputes concerning the application of the technical and net metering interconnection rules, promulgated by the PUC, which apply to “customer-generators.” 52 Pa. Code §§ 75.31, 75.51. Section 75.51 provides, in pertinent part, as follows:
(a) A party shall attempt to resolve- all disputes regarding interconnection[5] as provided in this chapter promptly, equitably, and in a good faith manner.
(b) When a dispute arises, a party may seek immediate resolution through complaint procedures available through the [PUC], or an alternative dispute resolution process approved by the [PUC], by providing written notice to the [PUC] and the other party stating the issues in dispute.
* * *
52 Pa. Code § 75.51(a)-(b) (emphasis added). The above regulation, promulgated in accordance with the Legislature’s express grant of power to do so, directs an obviously aggrieved “customer-generator” “who is rebuffed by” an electric generation company (EDC) or electric generation supplier (E6S) to use the complaint procedures available through the PUC, as set forth in Section 701 of the Public Utility Code, 66 Pa. C.S. § 701.[6]
Moreover, the Public Utility Code and the AEPS Act both involve the regulation of EDCs, EGSs, and- the sale of electric energy to retail customers in the Commonwealth. The AEPS Act is replete with references to the Public Utility Code, including 66 Pa. C.S. §§ 511, 1307, 2807, 2808, 2812, and 3315, and also makes express use of certain definitions found within the Competition Act of the Public Utility Code, 66 Pa. C.S. § 2803. See 73 P.S. §§ 1648.2, 1648.3. There is no question that the PUC is the agency that “administers the [regulatory] scheme” undér the Public Utility Code. Although this may not be “a utility rate case,” (Maj. Op. at 905), the Competition Act requires EDCs, like West Penn, to purchase energy from a “customer-generator” in a manner that ensures adequate and reliable service at the least cost to customers over time. Competition Act, as amended, 66 Pa. C.S. § 2807(e)(3.4). Thus, the AEPS Act regulations implement this requirement by requiring EDCs, like West Penn, to offer net metering to certain customer-generators and to enter into net metering agreements with those customer-generators. The regulations also prescribe the rate at which a customer-generator will be compensated for energy produced, *913 the amount to be paid for excess- energy-generated, and other costs under an agreement. See 52 Pa. Code § 75.13. As such, the net metering agreement in this case, which was entered into subject to the Net Energy Metering Rider to the West Penn Tariff, and the purportedly improper termination thereof, necessarily involve the reasonableness, adequacy, and/or sufficiency of the service and rates of West Penn, a public utility, with regard to net metering. Moreover, if West Penn has to pay for alternative energy at the full retail rate that a customer-generator receives when it is not actually a customer-generator as that term is defined under the AEPS Act, then other ratepayers or the public utility may have to pay more for electricity.
Thus, this is not a simple statutory interpretation question as the majority posits. Rather, the question here involves the complex interplay of the electric service scheme and the use of alternative forms of energy, as regulated and administered under the Public Utility Code, the Competition Act, and the AEPS Act. Where statutes or parts of statutes “relate to the same persons or things or to the same class of persons or things,” they are in pari materia and “shall be construed together, if possible, as one statute.” 1 Pa. C.S. § 1932(a)-(b). The question of whether a generation facility qualifies as a “customer-generator” entitled to the special compensation provisions of “net-metering” has a significant impact on the provision of electric service and is intertwined with the interpretation and application of West Penn’s tariff and its provision of' services to its other customers. “It is well-settled law that initial jurisdiction over matters involving the reasonableness, adequacy!,] or sufficiency of a public utility’s service, facilities!,] or rates is vested in the PUC and not in the courts.” Morrow v. Bell Tel. Co., 330 Pa.Super. 276, 479 A.2d 548, 550 (1984). The PUC also has exclusive jurisdiction over a utility’s “formation of reasonable rules and regulations governing the conditions under which service, facilities!,] and rates shall be rendered, constructed!,] or imposed.” Id. Therefore, we are required to read the Public Utility Code, the Competition Act, and the AEPS Act in pari materia in ascertaining whether the PUC has jurisdiction over the issues in this case,
In arriving at its conclusion, the majority considered only whether the AEPS Act contains an “express” grant of authority, and it did not consider whether such authority may be inferred based on a “strong and necessary implication” from the text as this Court did in ARIPPA, 966 A.2d at 1211. In acknowledging the PUC’s jurisdiction and authority under the AEPS Act, we recognized that although “[t]he legislature imbues the [PUC] with authority in enabling statutes [and] [t]he' statutory grant of power must be clear!,] [i]f the statute’s text does not provide the [PUC] with specific authority, a strong and necessary implication from such text may, nonetheless, provide such authority.” Id, As discussed above, the Legislature has expressly granted the PUC authority to administer the AEPS Act, including defining the terms at issue here. However, to the extent it did not do so, there is at the very least a “strong and necessary implication” from the text of such authority.[7]
That the relief requested is framed in terms of damages does not require a different result. In Elkin, the Supreme Court *914 rejected the plaintiffs reliance upon the analysis set forth in Feingold to support his assertion that the PUC does not have jurisdiction in any case involving an action for damages. Elkin, 420 A.2d at 376. The Supreme Court found that this “interpretation [of Feingold] ... is too broad and would ‘virtually strip’ the PUC of all jurisdiction merely by framing the allegations in contractual and/or trespassory terminology, and demanding damages.” H. at 375. Instead, the Supreme Court clarified that the issue in Feingold was concerned only with the adequacy of remedies available under the law, and resolution of that issue was not based upon whether the PUC had jurisdiction. Id. at 375. Because the majority relied on Feingold without considering the Supreme Court’s subsequent clarification of that decision in Elkin, I am not persuaded by that analysis. (Maj. Op. at 901.)
In sum, given that the PUC was specifically tasked -with developing, implementing, and monitoring the AEPS Act, I would find that “[t]he competence of the [PUC] in the[ ] area[ of alternative energy and net metering, generally,] is substantially greater. than the . court’s, and the need for uniformity of policy is apparent.” Elkin, 420 A.2d at 376-77. By holding that the PUC does not have primary exclusive jurisdiction to decide the specific definitional issues in this case, the majority takes a large step backwards with regard to the fundamental concern of promoting consistency and uniformity in the public utility arena and in'the area of alternative energy. Id. at 376. Moreover, it is the PUC, not the courts, that was tasked with both restructuring the electric service industry and administering the AEPS Act based upon the PUC’s special experience and expertise in such complex areas. See 66 Pa. C.S. § 2804; 73 P.S. §§ 1648.5, 1648.7. It follows that neither consistency nor uniformity is achieved by permitting the courts of common pleas of this Commonwealth to impose differing interpretations of the AEPS Act, the administration of which is specifically committed to a particular administrative agency, the PUC.
For the foregoing reasons, I respectfully dissent and would reverse the order of the trial court and require it to cede jurisdiction over the case to the PUC under the doctrine of primary exclusive jurisdiction.
Judge Covey joins in this dissenting opinion.

.Act of November 30, 2004, P.L. 1672, as amended, 73 P.S. §§ 1648.1-1648.8. "The purpose of the [AEPS] Act is to encourage growth and investment in renewable sources of energy. The [AEPS] Act achieves this goal by requiring that '[e]xcess generation from net-metered customer-generators shall receive full retail value for all energy produced on an annual basis.’ 73 P.S. § 1648,5 (emphasis added).” Dauphin Cnty. Indus. Dev. Auth. v. Pa. Pub. Util. Comm'n, 123 A.3d 1124, 1131 (Pa. Cmwlth. 2015), appeal denied, 140 A.3d 14 (Pa. 2016).

. Act of July 1, 1978, P.L. 598, 66 Pa. C.S. §§ 101-3316.

. Act of December 3, 1996, P.L. 802, 66 Pa. C.S, §§ 2801-2815.

. See, e.g., 73 P.S. § 1648.2 (definition of "customer-generator” requires that the PUC promulgate technical rules for operating generators interconnected with facilities of an electric distribution company (EDC); definition of "force majeure" requires, inter alia, that the PUC shall determine if alternative energy resources are reasonably available in the marketplace in sufficient quantities for the electric distribution companies and electric generation suppliers to meet their obligations under the Act); 73 P.S. § 1648.3(e)(l)-(3), (11) (requiring that the PUC establish an alterna-five energy credits program, as needed, to implement the Act, and approve an independent entity to serve as the alternative energy credits program administrator; providing that the PUC will approve qualifying meters); 73 P.S. § 1648.7 (requiring that the PUC and the DEP conduct an ongoing alternative energy resources planning, assessment for the Commonwealth, which will,- at a minimum, identify current and operating alternative energy facilities, the potential to add future alternative energy generating capacity and the conditions of the alternative energy marketplace).

. The issue in this case involves an "interconnection'' dispute because Sunrise Energy, LLC is an operating generator facility that is interconnected with West Penn’s distribution facility, and is thus, purportedly, a "customer-generator” subject to the technical and net metering interconnection standards developed by the PUC.

. Section 701 of the Public Utility Code provides, in pertinent part, as follows:
The [PUC], or any person, corporation, or municipal corporation having an interest in the subject matter, or any public utility concerned, may complain in writing, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the [PUC] has jurisdiction to administer, or of any regulation or order of the [PUC], Any public utility, or other person, or corporation likewise may complain of any regulation or order of the [PUC], which the complainant is or has been required by the [PUC] to observe or carry into effect.
* * *
66 Pa. C.S. § 701 (emphasis added). Section 5.21 of the PUC regulations also provides, in pertinent part:
(a) A person complaining of an act done or omitted to be done by a person subject to the jurisdiction of the [PUC], in violation, or claimed violation of a statute which the [PUC] has jurisdiction to administer, or of a regulation or order of the [PUC], may file a formal complaint with the [PUC],
52 Pa, Code § 5.21 (emphasis added).

. See also Dep't of Envtl. Res. v. Butler Cnty. Mushroom Farm, 499 Pa. 509, 454 A.2d 1 (1982). The question in that case was whether the Department of Environmental Resources (DER) had the authority to issue- administrative compliance orders under the Pennsylvania General Safety Law (Act), Act of May 18, 1937, P.L. 654, as amended, 43 P.S. §§ 25-1-25-15, In considering the issue, the Supreme Court reiterated the well-settled principle that *914 "[t]he powers and authority [to be exercised by administrative agencies] must be either expressly conferred [by the legislature] or given by necessary implication." Id. at 4 (emphasis added) (citations omitted). The appellees argued that statutory construction was not necessary because the clear language of the Act did not grant DER the authority to issue such orders, and thus there was no enforcement scheme. Id. at 5. The Supreme Court rejected that argument and stated that such position "ignored the facts that ... it is inappropriate to determine the power of an administrative agency in a linguistic vacuum ... and ... the power of administrative agencies includes such powers as are implied necessarily." Id. at 6. As for appellees'-contention that there was no enforcement scheme in the Act, the Supreme Court concluded that such argument was "factually inadequate” and "[t]he mere fact that this aspect of the enforcement scheme was not included in the Act is of no moment since the Act must be read in pari materia with the applicable portions of the Administrative Code.” Id. at 7 (citing 1 Pa. C.S. § 1932) (subsequent citations omitted). The Supreme Court clarified the issue in the case as one dealing with "the authority of the agency charged with the implementation” of the Act, and stated that the appellees "obviously, ignore[d] the well-recognized role of the adjudicative process as an alternative implementing tool.” Id.